## WOODWARD *v.* PAYNE & DEWEY.

WHERE a lease of a lot in San Francisco, for ten years, stipulated that the lessee should place "on said premises a building thirty by eighty feet, which has been shipped from the port of New York, to be put up immediately on arrival; or if lost, a similar one is to be ordered got up, and put up in the shortest possible time," and also, in a final clause, that if no agreement was made between the parties for a renewal of the lease for a further period, "then the valuation of the *buildings* is to be made by three disinterested persons," etc., and the lessor was to pay to the lessee the amount agreed on; and the lessee erected a building worth about $1,000, which was burned, and then another similar one, and subsequently sub-let the premises to plaintiff, who put up a valuable building, costing $50,000—defendants, who had bought the lot, notifying him, before he erected his building, that they would not pay for it: *Held*, that at the expiration of the term, defendants were not bound to pay plaintiff for his improve-

ments : that the term "*buildings*," though in the plural, refers to the building mentioned in the fore part of the lease, aad not to any buildings the lessee might erect—especially when the conduct of the parties, the nature of the transaction, and the surrounding circumstances are considered.

The terms of this lease so construed as to give completeness to the agreement, and to make it a just, fair, and equal contract, mutually obligatory in its essential provisions, instead of a one-sided and unreasonable contract.   (See opinion.)

APPEAL from the Twelfth District.

Suit to establish the right of plaintiff to compensation for certain improvements placed by him on a lot in San Francisco, leased by his lessors from the vendor of defendants ; to have the value of the im- provements appraised in such manner as the Court should direct, and the premises sold to pay the same, and for an injunction, restraining defendants from disturbing the plaintiff's possession until payment for the improvements.   Answer being put in, the case was tried by the Court.   The real question was as to the construction of the lease from Price to Cook, Baker & Co., and the material facts appear in the opinion of the Court.   Defendants had judgment.   Plaintiff appeals.

*Heydenfeldt,* for Appellant.

1. The seventh covenant is independent.   (*Douse* v. *Cole,* 2 Ventris, 128 ; 1 Platt on Leases, 198, 203 ; Comyns on Land and Ten. 208 ; *Stavers* v. *Corling,* 3 Bing. N. C. 355 ; *Wood* v. *Day,* 7 Taunt. 646 ; *Terry* v. *Duntze,* 2 H. Black. 389 ; *Taylor* v. *Patterson,* 3 Pike, 238.)

Where mutual covenants go only to a part of the consideration, and a breach of that part may be paid for in damages, the covenants are independent.   (*Bennett* v. *Pixley,* 7 Johns. 249 ; *Payne* v. *Bettsworth,* 2 Marsh. 429 ; *Obermyer* v. *Nichols,* 6 Bin. 166.)

Where there are mutual covenants, and one party has received the principal part of the consideration, the covenants will be construed to be independent.   (*Tompkins* v. *Elliott,* 5 Wend. 496 ; *Muldson* v. *McClelland,* 1 Litt. 1 ; 13 Mass. 410.)

If money is to be paid on a day certain, which is before the cove- nants on the other part are to be performed, the covenants are independ- ent.   (*Church* v. *Ingersol,* 2 Pick. 300 ; *Seers* v. *Fowler,* 2 Johns. 272 ; *Cunningham* v. *Morrill,* 10 Id. 203 ; *McCoy* v. *Bixbee,* 6 Ham. 312.)

Covenants are dependent or independent, according to the intention of the parties and the good sense of the case.   (*McCrellish* v. *Church-*

*man,* 4 Rawle, 26 ; *Tileston* v. *Newell,* 13 Mass. 410 ; *Tomkins·*v. *Elliott,* 5 Wend. 496; *Barnes* v. *Medan,* 2 Johns. 145.)

The intention is to be gathered rather from the order of time in which the acts are to be done, than from the structure or arrangement of the stipulations. (*Goodwyn* v. *Lynn,* 4 Wash. C. C. 714; *Speake* v. *Shephard,* 6 Har. & J. 85 ; *Gardner* v. *Casson,* 15 Mass. 504; *Hopkins* v. *Young,* 11 Id. 304.)

Covenants for renewal are always independent, unless stipulated to the contrary. (*Hart* v. *Hart,* 22 Barb. 606.)

*Delos Lake,* for Respondents.

The plaintiff is not entitled to compensation for improvements which were on the premises at the expiration of the term. The intention of the lease was, that the lessor should pay ·for the particular building named therein, and no other. The whole instrument must be looked to for that intention ; separate and disjointed parts are not to be construed separately, but the whole so construed as to give force and effect to every provision. (*Browning* v. *Wright,* 2 Bos. & Pul. 13 ; *Whalling* v. *Kauffman,* 19 Johns. 97 ; *Jackson* v. *Stevens,* 16 ·Id. 100 ; *Summer* v. *Williams,* 8 Mass. 189.)

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. concurring.

The principal question in this case arises from the construction of a certain lease executed by Rodman M. Price to Cook, Baker & Co., dated fifth of April, 1849, of a lot in the city of San Francisco. This lot is situated on Sacramento street, and is thirty-four feet four inches front, and running back one hundred and thirty-seven and a half feet. The lease is for a term of ten years. On the eighteenth of May, 1852, Cook, Baker & Co. leased the premises to the plaintiff, Woodward, from that date until fifth of April, 1859, for the yearly rent of five hundred dollars, payable quarterly, on or before the fifth of April, July, October, and January, and also the further rent of one thousand dollars, subject, also, to the conditions of the lease from Price. An iron building was erected on the demised premises, by Cook, Baker & Co., in 1850, which building was burned in the spring of 1851, and afterwards another building, of similar description, was put up in its place. The plaintiff, in the summer of 1852, put up, on the premises, two wooden buildings, which were afterwards connected, and in 1853, a

third building; the whole were connected, and covered the lot. In 1854, a brick building was put up by plaintiff, at a cost of some $50,-000, which is still on the premises. Payne & Dewey, before this, viz: in June, 1853, bought the land from Price; and in March, 1854, and before the brick building was put up, gave notice to the plaintiff, Woodward, that they would not pay for any building he might put up. The lease from Price to Cook, Baker & Co. expired fifth of April, 1859. Woodward refused to surrender possession at the expiration of the term, claiming that he had a right to hold until payment of the value of the improvements. The iron house mentioned in the lease was of comparatively small value—about one thousand dollars—as was the next put up in its place.

The lease from Price to Cook, Baker & Co. is not very artificially drawn. It will be necessary to examine, carefully, its provisions, in order to fix its construction. After describing the parties and the property, the instrument provides—first, that the lessee shall pay the yearly rent of five hundred dollars, for the term of ten years from this date, "and the said R. M. Price, his heirs, and assigns, guarantee the quiet and peaceable possession of said property for said term of ten years, and it is further understood by said parties, that the said firm of Cook, Baker & Co. are to place or cause to be placed on said premises, a building thirty by eighty feet, which has been shipped from the port of New York, to be put up immediately on arrival; or, if lost, a similar one is to be ordered, got up, and put up in the shortest possible time; and it is further understood by the parties, that three feet of said lot hereby leased, on the westerly side, and four feet of the lot adjoining, owned by the said party of the first part, is to be thrown open as a cartway, and not to be occupied by either of the said parties, both parties having the right of way over the same, from Sacramento street to the rear of said lot. And it is further understood by said parties, if no agreement be made between them for a renewal of said lease for a further period of years, then the valuation of the buildings is to be made by three disinterested persons—one to be named by each of the parties hereto, and the third to be agreed upon by said two persons, and the said party of the first part, his heirs and assigns, are to pay the amount so fixed to the said parties of the second part, their heirs and assigns."

It is contended, by the appellant's counsel, that the latter clause of the lease was designed to give to the lessee the right to put up any

buildings he chose, during the period of the lease, and to claim compensation for the value of them, before the lessee or his vendee is entitled to possession of the premises. This position is based upon the word " *buildings*," as used in this clause—it being contended that the plural noun, used in this connection, was designed to assure this right. If the final " s " had not been affixed to the word italicized, it will be seen at once that no such construction could be given to the instrument. We do not dispute the rule of construction of contracts given by the counsel. The primary object is, to attain the meaning of the parties; and this meaning is to be gathered from the language which they have employed, the subject to which it applies, the nature of the transaction, and surrounding circumstances. But by no rule which we can apply can the result reached by them be regarded as the true or rational conclusion; for whether we take the whole instrument together, or its separate parts—whether we look to the strict import of the words, or to the reason and sense of the whole, the same conclusion, adverse to this construction, follows.

We may remark, that as Woodward affirms the contract in this form, and with this effect, he is bound to show it to exist as he affirms it to be. If we cannot gather such a contract as he sets forth from the materials before us, we could not be justified in interposing our own doubtful supposition as a substitute for the contract upon which he declares. He would be in the situation of every other litigant who rests his case upon proof of a fact which he fails satisfactorily to establish. But when we examine this lease in the light of surrounding circumstances, we think the meaning, if not clear, certainly is not shown to be as plaintiff claims. We have said that the paper is inartificially drawn. All the provisions seem to be run together in one general statement. First come the parties, then the consideration, then the obligation to put up a building of a given description, then the provision for another of like kind, if the first be not put up or be lost; then a provision in respect to the alley; then, and finally, the provision for the valuation of *the buildings*, in case no renewal of the lease is made. What buildings? Is it to be presumed that those or that already referred to were meant, or that other buildings, not before referred to, were the subject of allusion? If so, it were easy to describe the building meant, and to leave no doubt as to those intended. It is more rational to suppose that when a general allusion is made, at the end of a document, which as well applies to something going before as to new matter, that the

reference is to the thing already given. If, by this reference, new, or other structures than those first mentioned, were intended, the idea and the sentence are both incomplete; whereas, if we suppose that they refer to the preceding matter, the sentence is complete. Although the lease is not very well drawn, yet in other places there is no want of clearness in the different provisions of it, or of fullness in the expression of the ideas designed. Again: the bargain between the parties is equal and reciprocal, upon the supposition that the building referred to was that first in the contract mentioned. The lessee was bound to furnish a building of a particular description. As a correlative right, he was entitled to be paid for it, on the expiration of the lease. It is much more rational to suppose that the parties settled, by the contract, the substantial rights involved in it, than that the lessor meant to leave open the terms of the contract, and to allow the lessee to make those terms what he chose. Especially is this supposition the more reasonable, when we reflect that the rent was low, the lessor subjected to taxes, the term long, and that the effect of this construction would be, to allow the lessee to build, at the lessor's expense, when he chose, how he chose, what sort of buildings he chose, and at what expense he chose; and thus, practically, put the possession of the property, and its value, at the mercy of the lessee. In the one case, we have a mutually obligatory contract, fair and equal in its terms, and simple, plain, and just in its meaning; in the other, a contract with the effect of which the lessor must necessarily be ignorant, upon which he could make no calculation, and which might be ruinous in its operation. The whole stress of the adverse argument is in the word *buildings*. We think this word is to be construed in connection with what precedes; that having specified and provided for certain buildings to be erected, the paper meant, in the latter clause, to provide for payment for them when the lessee no longer kept them.

The fact that the word is used in the plural, amounts, under the circumstances, to but little. We cannot give to a single letter the effect of making such a contract as that supposed—a contract opposed to the fair inferences from the body of the paper, and which might destroy the whole value of the property, or put it wholly out of the power of the lessor ever to regain its possession. Besides, it may be observed that this word, in the plural, if not a mere clerical error, might possibly have been so put as referring to the two buildings contemplated in the preceding part of the lease, viz.: the one supposed to be on the way,

and the one to be substituted for it, if the first should be lost; and though but one was to be paid for, of course, yet the plural noun *may* have been used upon the notion that the singular would only refer to the one first mentioned, and not to either of the two in contemplation; or, as has been suggested, the word might have been used to embrace structures connected with the building, and auxiliary to it.

Nor is there anything at all unreasonable in the contract, as we construe it. The lessee was not bound to put up other houses than those particularly specified. The houses contemplated seem to have been of a permanent character, and destruction by fire, probably, was not, at that early day, taken into account as a probable occurrence. If, beyond this building, the lessee chose to put up other buildings, as he might, since the term was long and the rent low, he could do so at his own expense, or this might be the subject of future arrangement. The lessee was bound only to a given extent as to improvements; his will and that of the lessor met as to this term; the obligations were reciprocal, the benefits and burdens equal, and the terms of the whole contract closed, and the rights of the parties liquidated and ascertained. Each party knew what was to be got, what to be paid and what to be expected. But the contrary construction supposes a contract, the terms and results of which are uncertain; comparatively unimportant terms settled, and more important ones left unsettled; one party bound, and the other loose; a discretion to be exercised by the lessee over the lessor's property, which might greatly affect its value; and the extent of the liability of the lessor left to the uncontrolled will of the lessee and his assignees. Indeed, if we give the construction asked, Price put himself completely in the power of the lessee and his assigns; for he was bound absolutely to pay for all buildings that might be put on the premises at the end of the lease, if it was not renewed, and the renewal was not obligatory upon the lessee; no limitation existed as to the number of buildings; the kind of structures, whether for residence or business. The lessee might erect a market house, a livery stable, a hotel, or stores, or warehouses, or even buildings for uses, which, in relation to the locality where erected, might make them not at all useful or valuable to the lessor, or any other person than the lessee. At any rate, such a contract might have the effect of creating a debt against the lessor for the improvement, which debt even the whole property might be insufficient to pay. When we can construe the words of the lease so as to give completeness to the agreement, and to make of it a just,

fair and equal contract, mutually obligatory in its essential provisions, we think we should give it that construction, in preference to a contrary interpretation, when the latter construction is to be deduced from an incomplete sentence, equivocal even as it stands, but which, explained by the context, is in harmony with the design and intent we have attributed to the instrument.

We are bound to give a reasonable interpretation to, the conduct as well as to the contract of these parties; and we cannot presume from anything before us, that Price would have made so unreasonable a disposition of valuable property as the appellant's counsel suppose; nor that he would have trusted this lessee and any number of assignees, during the long period of ten years, with the power of making contracts for him; binding him personally and his property, at their pleasure, for improvements of whatever sort, without reserving to himself any agency in the character of the improvements, or the time, place or manner in which they should be made.    No sane man would make a contract by which he would incur liabilities unlimited in extent, by the mere acts of agents whose conduct he could not control, and of whose names and persons he was ignorant.

This view of the case makes it unnecessary to consider the other questions in the record.

Judgment affirmed.